No. DA 06-0740

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 75

MONTANANS FOR EQUAL APPLICATION
OF INITIATIVE LAWS, a Montana corporation,

Plaintiff and Appellant,

v.

STATE OF MONTANA, by and through
BRAD JOHNSON, in his capacity as
Secretary of State, RAISE MONTANA'S
COMMITTEE TO INCREASE THE MINIMUM
WAGE, Political Ballot Committee,

Defendants and Respondents.

APPEAL FROM: The District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. ADV 2006-1387,
Honorable Kenneth R. Neill, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

David G. Dennis, Church, Harris, Johnson & Williams, P.C.,
Great Falls, Montana

For Respondent State of Montana:

Hon. Mike McGrath, Montana Attorney General, Anthony Johnstone,
Pam Bucy, Assistant Attorneys General, Helena, Montana

For Respondent Raise Montana's Committee to Increase the Minimum Wage:

James P. Molloy, Molloy Law Firm, Helena, Montana

Brian K. Gallik, Goetz, Gallik & Baldwin, P.C., Bozeman, Montana

Submitted on Briefs:  December 20, 2006

Decided:  March 19, 2007

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1     Montanans for Equal Application of Initiative Laws (Opponents) filed an action seeking to invalidate certain signatures gathered on behalf of Initiative 151 (I-151) and to enjoin the Secretary of State from including this initiative on Montana's November 7, 2006 general election ballot.  After an expedited hearing, the District Court for the Eighth Judicial District, Cascade County, granted summary judgment concluding that Opponent's claim was barred by the 30-day limitations period contained in § 3-5-302(6), MCA.  Opponents appeal.  We hold that Opponents' appeal has been rendered moot by Article III, Section 4(3) of the Montana Constitution.

¶2     Opponents raised the following issue on appeal:  Whether the District Court erred in determining that § 3-5-302(6), MCA, bars Opponents' challenge to I-151.

### Factual and Procedural Background

¶3     I-151 is a ballot initiative intended to increase the state minimum wage.  Raise Montana's Committee to Increase the Minimum Wage (Raise Montana) is a registered political committee whose purpose is the support of I-151.  On January 24, 2006, the Secretary of State approved Raise Montana's petition to place I-151 on the November 7, 2006 general election ballot.  Thereafter, Raise Montana began the process of gathering the signatures necessary to place I-151 on the ballot.

¶4     Each petition contained the following "Statement of Purpose":

> This measure raises the state minimum wage to the greater of either $6.15 an hour or the federal minimum wage.  This measure also adds an annual cost-of-living adjustment to the state minimum wage.  Under existing law, the state minimum wage is equal to the federal minimum wage, which is $5.15 an hour with no cost-of-living adjustment.  This measure does not

3

change the $4.00 an hour minimum wage for a business whose annual gross sales are $110,000 or less. This measure would take effect January 1, 2007.

¶5 Raise Montana submitted its first petition signatures to county election administrators for their review on February 2, 2006. In April or May 2006, Raise Montana decided to employ a limited number of paid signature gatherers to supplement its volunteer force.

¶6 On July 12, 2006, the Secretary of State notified the Governor that a sufficient number of valid signatures had been obtained to qualify I-151 for the general election ballot. As of that date, 22,527 valid signatures comprising at least five percent of the qualified electors in 43 legislative representative districts, had been obtained on the I-151 petitions. The Secretary of State eventually certified a total of 33,925 signatures for I-151; 11,617 more than necessary to qualify I-151 for the ballot.

¶7 On September 13, 2006, the District Court for the Eighth Judicial District, Cascade County, invalidated the certifications of CI-97, CI-98 and I-154. The court found that

> it was more probable than not that the out-of-state signature gatherers executed certification affidavits attesting that they personally gathered or assisted in gathering signatures that someone else actually gathered outside of their presence without any direct assistance from them. . . . [And that the] evidence established that the signers were located in various cities and counties throughout the state and that the attesting signature gatherer could not have possibly been present when many persons signed their petitions.

*Montanans for Justice v. State ex rel. McGrath*, 2006 MT 277, ¶ 45, 334 Mont. 237, ¶ 45, 146 P.3d 759, ¶ 45. The court also found substantial evidence of widespread fraud and

4

the use of highly-paid, out-of-state signature gatherers who fraudulently induced Montanans to sign the petitions at issue. *Montanans for Justice*, ¶¶ 2, 44.

¶8 Opponents filed their Complaint against the State, by and through the Secretary of State, and against Raise Montana on October 3, 2006, seeking to decertify I-151 from inclusion on Montana's November 7, 2006 general election ballot. Opponents argued in their Complaint that those individuals gathering signatures to place I-151 on the ballot, engaged in signature gathering practices that violated state law. Specifically, Opponents contended that those signature gatherers submitting affidavits with each sheet of signatures did not actually "gather or assist in gathering" the accompanying signatures in violation of § 13-27-307, MCA. Opponents did not contend that any of the signatures on the petitions for I-151 were obtained by fraud, deceit or misrepresentation. Opponents' Complaint was filed 83 days after the Secretary of State certified I-151 for inclusion on the ballot.

¶9 Opponents moved for an expedited hearing on their Complaint. The Honorable Kenneth Neil of the District Court for the Eighth Judicial District, Cascade County, assumed jurisdiction of the case and granted Opponents' motion to expedite.

¶10 On October 16, 2006, Raise Montana filed a Motion for Summary Judgment contending that Opponents' challenge to I-151 was barred by the 30-day limitations period in § 3-5-302(6), MCA, which provides:

> (6) (a) Except as provided in subsection (6)(b), a contest of a ballot issue submitted by initiative or referendum may be brought prior to the election only if it is filed within 30 days after the date on which the issue was certified to the governor, as provided in 13-27-308, and only for the following causes:

5

(i) violation of the law relating to qualifications for inclusion on the ballot;

(ii) constitutional defect in the substance of a proposed ballot issue; or

(iii) illegal petition signatures or an erroneous or fraudulent count or canvass of petition signatures.

(b) A contest of a ballot issue based on subsection (6)(a)(i) or (6)(a)(iii) may be brought at any time after discovery of illegal petition signatures or an erroneous or fraudulent count or canvass of petition signatures.

(c) Nothing in subsection (6) limits the right to challenge a measure enacted by a vote of the people.

Raise Montana argued that Opponents were required to file their challenge within 30 days of the date I-151 was certified to the Governor because Opponents could have discovered the illegal signatures at that time.

¶11 On October 25, 2006, the District Court heard argument on Raise Montana's summary judgment motion. During the hearing, Opponents' counsel admitted that the facts upon which his client relied for its Complaint were available both before the Secretary of State certified I-151 for the ballot and within 30 days after the Secretary of State certified I-151 for the ballot. The court took the matter under advisement and immediately proceeded to the scheduled bench trial.

¶12 Thereafter, the District Court granted Raise Montana's Motion for Summary Judgment and dismissed Opponents' Complaint. In its November 3, 2006 order granting Raise Montana's motion, the court concluded that Opponents' claim was barred by the 30-day limitations period set forth in § 3-5-302(6), MCA. Opponents filed their Notice of Appeal on November 6, 2006, the day before the general election. Opponents requested an expedited appeal process and asked this Court to enjoin the Secretary of

6

State from canvassing and transmitting the statement of the canvas on I-151 pending final resolution of this matter. We granted Opponents motion to expedite the appeal, but denied Opponents motion to enjoin.

¶13     On November 7, 2006, election day, 73% of Montana voters approved I-151 with 285,535 persons voting in favor of the initiative and 27% of Montana voters, or 107,294 persons, voting against it. *See Montana Ballot Measures*, http://leg.mt.gov/textonly/ research/information/ballot_measures.asp (accessed March 8, 2007).

## Standard of Review

¶14     We review a district court's decision to grant summary judgment de novo, applying the same evaluation under M. R. Civ. P. 56, as the district court. *Cole ex rel. Cole Revocable Trust v. Cole*, 2003 MT 229, ¶ 8, 317 Mont. 197, ¶ 8, 75 P.3d 1280, ¶ 8 (citing *Vivier v. State Dept. of Transp.*, 2001 MT 221, ¶ 5, 306 Mont. 454, ¶ 5, 35 P.3d 958, ¶ 5). In this regard, we have stated that

> [t]he movant must demonstrate that no genuine issues of material fact exist. Once this has been accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does exist. Having determined that genuine issues of fact do not exist, the court must then determine whether the moving party is entitled to judgment as a matter of law.

*Cole*, ¶ 8 (quoting *Bruner v. Yellowstone County*, 272 Mont. 261, 264-65, 900 P.2d 901, 903 (1995)).

¶15     Moreover, in evaluating a motion for summary judgment, "the evidence must be viewed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn therefrom in favor of the party opposing summary judgment." *Prindel v.*

7

*Ravalli County*, 2006 MT 62, ¶ 19, 331 Mont. 338, ¶ 19, 133 P.3d 165, ¶ 19 (quoting

*Lopez v. Great Falls Pre-Release Services,* 1999 MT 199, ¶ 16, 295 Mont. 416, ¶ 16, 986

P.2d 1081, ¶ 16).   In addition, we review a district court's legal conclusions for

correctness.  *Cole*, ¶ 8.

## Discussion

¶16    The Montana Constitution allows for the enactment of statutes by initiative.  Mont.

Const. art. III, § 4.  In addition, Title 13, Chapter 27, MCA, sets forth the procedures by

which statutes may be enacted by initiative.   The following is a summary of the

procedures set forth in Title 13, Chapter 27.

¶17    The Montana Attorney General and the Secretary of State must approve a petition

before the petition is circulated for signatures.   Section 13-27-202(3), MCA.   The

Secretary of State makes the final decision as to the approval or rejection of the petition.

Section 13-27-202(4)(a), MCA.  Once approved, statutory initiative petitions

> [s]hall be signed by at least five percent of the qualified electors in each of
> at least one-half of the counties and the total number of signers must be at
> least five percent of the total qualified electors of the state.

Mont. Const. art. III, § 4(2).  In other words, in order to qualify for a general election

ballot, proponents of an initiative must obtain the signatures of five percent of the voters

in each of 34 legislative districts in addition to a statewide total of 22,308 signatures.

*Montanans for Justice*, ¶ 9.

¶18    Petition signatures are submitted to the applicable county election administrators

to certify that the person who signed the petition is a registered voter in their county.  The

county election administrators check all of the names of the petition signers and compare

a sample of the signatures on each petition against the signatures on voter registry cards. They then tally the number of valid signatures that correspond to registered voters in their county. Section 13-27-303(1), MCA. Those numbers are then forwarded, along with the petitions, to the Secretary of State's Office. Section 13-27-304, MCA.

¶19   The Secretary of State tallies the number of certified signatures that are provided to him by the county election administrators, by house district. Section 13-27-307, MCA. Once the requisite number of signatures for each district is obtained, the Secretary of State notifies the Governor that he has certified that a sufficient number of signatures has been obtained to qualify the measure for the general election ballot. Section 13-27-308, MCA. That same day, the Secretary of State transmits a copy of the form in which the initiative will appear on the ballot to the Attorney General for approval. Section 13-27-310, MCA.

¶20   The Secretary of State then prepares a Voter Information Pamphlet containing, among other things, the complete text of the initiative and the form in which it will appear on the ballot. Section 13-27-401, MCA. Thereafter, the Secretary of State furnishes to the official of each county responsible for preparation of the ballots a certified copy of the form in which the initiative is to appear on the ballot. Section 13-27-501, MCA. Each county official responsible for the preparation of the ballots is required to insure that the initiative appears on the official ballots in the form certified by the Secretary of State. Section 13-27-502, MCA.

¶21   After the election, the Secretary of State prepares a statement giving the whole number of votes cast in the State for and against the initiative and transmits a certified

9

copy of the statement to the Governor.  Section 13-27-503, MCA.  If the initiative was approved by a majority of the voters, the Secretary of State also sends a certified copy of the initiative along with a copy of the statement referred to above to the legislative services division.  Section 13-27-504, MCA.

¶22    In the case *sub judice*, the District Court concluded that Opponents' claim was untimely under § 3-5-302(6), MCA, because it was not filed within 30 days after the date on which the Secretary of State notified the Governor that a sufficient number of signatures had been obtained to qualify I-151 for the general election ballot.  Hence, the court granted Raise Montana's Motion for Summary Judgment and dismissed Opponents' Complaint.

¶23    ***Whether the District Court erred in determining that § 3-5-302(6), MCA, bars Opponents' challenge to I-151.***

¶24    Opponents contend on appeal that the District Court adopted an interpretation that ignores the plain language of § 3-5-302(6)(b), MCA, and constitutes an unjustified and improper redrafting of that statute.  Opponents maintain that rather than reading this statute as written by the Legislature to provide that a contest of a ballot issue based on subsection (6)(a)(i) or (6)(a)(iii) may be brought "*at any time after discovery* of illegal petition signatures" (emphasis added), the District Court improperly interpreted the statute to read that a contest of a ballot issue based on subsection (6)(a)(i) or (6)(a)(iii) may be brought "at any time *within 30 days after plaintiff could have discovered* the illegal petition signatures" (emphasis added).  Opponents assert that the District Court's interpretation radically changes the meaning and application of the statute and ignores the

10

longstanding rule of statutory construction that prohibits a court from "insert[ing] what has been omitted." Section 1-2-101, MCA.

¶25 Raise Montana, on the other hand, argues that the District Court correctly held that § 3-5-302(6)(a), MCA, barred Opponents' Complaint because Opponents waited 83 days after certification to bring their challenge and that challenge was based only on facts that had been publicly available at the Secretary of State's office. More importantly however, Raise Montana argues, and we agree, that under Article III, Section 4(3) of the Montana Constitution, Opponents challenge to the I-151 petitions is now moot. Article III, Section 4(3), provides: "The sufficiency of the initiative petition *shall not be questioned* after the election is held" (emphasis added). As Raise Montana points out in its brief on appeal, the phrase "shall not be questioned" erects an absolute bar that prohibits courts or administrative officials from engaging in any inquiry into the sufficiency of an initiative petition after the initiative has passed on election day. To hold otherwise would require reading into Article III, Section 4(3), wording that simply is not there.

¶26 The United States Supreme Court has recognized that the phrase "shall not be questioned" is absolute. *See e.g. Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 501, 95 S.Ct. 1813, 1820 (1975) (noting the absoluteness of the terms "shall not be questioned" in the United States Constitution's Speech or Debate Clause, Art. I, § 6).

¶27 A review of the record of the 1972 Montana Constitutional Convention confirms that the convention delegates intended that challenges to initiative petitions be barred once a majority of the electorate approved the initiative. Delegate Mark Etchart, chairman of the committee responsible for recommending the provisions governing

11

initiatives, explained that the purpose of the initiative petition signature requirement of five percent is "to prevent frivolous legislative efforts by a small minority" but still "allow serious popular measures to be initiated by the people." Montana Constitutional Convention, Verbatim Transcript, March 18, 1972, p. 2696. As Raise Montana notes in its brief on appeal, once an election is held and a majority of voters have approved an initiative, that concern is satisfied, thus the issue of petition signature requirements becomes irrelevant.

¶28 Similarly, the State notes in its brief that Article III, Section 4(3), expresses an absolute principle that once the vote has been held, the will of *all* of the people at the polling place moots any disputes about the will of *five percent* of the people in the petition process. We agree with the State's and with Raise Montana's arguments that after a majority of the Montana electorate have voted to support an initiative, it is absurd for the State and the courts to be tied up with the question of whether five percent of Montana voters had wanted it on the ballot.

¶29 At the 1972 Montana Constitutional Convention, Delegate Thomas Joyce proposed the language contained in Article III, Section 4(3), and it was adopted with little discussion. In proposing this addition to Article III, Section 4, Delegate Joyce stated:

> I propose to add this sentence just to make perfectly clear—I—when I was a young lawyer and knew everything, much more than I do now, I had the privilege of being an assistant attorney general and had the privilege of arguing in the Supreme Court of Montana the veterans' bonus initiative, and one of the challenges that was made in that case, after the election was held and after it passed overwhelmingly, was that the petitions that had been circulated in the various counties were insufficient, that some of the names were forgeries, and that sort of thing. And the argument was made, quite seriously, that, since the Constitution required that these petitions be

12

signed by the sufficient number in each county—and we had the dilemma, then, of going back and trying to prove whether or not some of them were forgeries. We argued to the Supreme Court that once the election was held, it couldn't be challenged, but notwithstanding, the attorney on the other side kept needling us that the Constitution was mandatory. And so, I just thought that perhaps this little sentence wouldn't do any harm to—*would make it perfectly clear in the future that once the election is held, why, you can't challenge the sufficiency of the petitions.*

Montana Constitutional Convention, Verbatim Transcript, March 18, 1972, pp. 2698-99 (emphasis added).

¶30    In the case that Delegate Joyce referred to, *State ex rel. Graham v. Board of Examiners*, 125 Mont. 419, 427-28, 239 P.2d 283, 289 (1951), this Court stated that "after the people have voted on the measure and a great majority of the voters throughout the state have expressed their approval, the courts presume that the public interest was there and technical objections to the petition or its sufficiency are disregarded."

¶31    The facts in *Graham* are these: At the general election on November 7, 1950, the people of Montana voted for an initiative providing for an honorarium to be paid to each resident of Montana who served in World War II. This initiative authorized the State Board of Examiners to issue bonds to raise funds necessary to pay the honorarium. It further provided that the bonds were to be payable from the proceeds of a two-cent increase in the tax on cigarettes. *Graham*, 125 Mont. at 421-23, 239 P.2d at 286. In February 1951, Graham and other taxpayers and cigarette smokers filed an action to restrain the sale of the bonds. They alleged defects in the petitions and irregularities in placing the measure on the ballot including signatures not properly certified, signatures lacking identifying addresses and signatures of individuals who resided outside Montana.

*Graham*, 125 Mont. at 423-24, 239 P.2d at 286-87. The District Court eventually dismissed the complaint and Graham appealed.

¶32    In reaching its holding in *Graham*, this Court cited with approval several cases from other jurisdictions. In one such case, where the sufficiency of a referendum petition was questioned, we noted that the Supreme Court of Nebraska had long ago determined that "the question must be raised in time for the *appellate court* to rule upon it prior to the election." *Graham,* 125 Mont. at 428, 239 P.2d at 289 (citing *Barkley v. Pool*, 169 N.W. 730, 732 (1918)) (emphasis added). To that end, the Supreme Court of Nebraska stated:

> [B]oth the Constitution and the statute contemplate a speedy hearing, to the end that judgment may be had in time for the next ensuing election, and that the courts would be justified in refusing to entertain an action or defense because of laches on the part of either of the parties.

*Barkley*, 169 N.W. at 732.

¶33    Consequently, both the Supreme Court of Nebraska and this Court articulated that it is not just a matter of filing the complaint before the election or even filing the appeal before the election. The complaint must be filed in time for the appellate court to rule upon it prior to the election. We confirmed this idea most recently in *Montanans for Justice v. State ex rel. McGrath*, 2006 MT 277, ¶ 31, 334 Mont. 237, ¶ 31, 146 P.3d 759, ¶ 31, wherein we stated that there is a "truncated timeline available for resolving preelection initiative challenges," during which those challenges must be "raised, proven, and if necessary remedied." In the case *sub judice*, Opponents waited until a few weeks before the election to file their Complaint, consequently they did not file their appeal in

14

this Court until the day before the election, hardly enough time for an appellate court to render a decision.

¶34 The reasons for prohibiting challenges to the sufficiency of initiative petitions were made clear in *Graham* and numerous other cases before and since our decision in *Graham*. For instance, we quoted with approval in *Graham* the following statement of the Supreme Court of Arizona:

> [A]fter a statute has been passed by a vote of the people and promulgated as the law, this court's sphere of inquiry is and should be whether the law itself in its final form is constitutional as to its provisions, and not whether there was a constitutional defect in the proceedings leading to its final passage. The act as initiated and proclaimed by the governor is the act that the court will examine in determining its constitutionality, and . . . we refuse to give legal effect to the procedural defect. There was a time to raise procedural questions, but it was before the votes were cast and not after the law had been proclaimed to be the law of the state.

*Graham*, 125 Mont. at 428-29, 239 P.2d at 289 (quoting *Hernandez v. Frohmiller*, 204 P.2d 854, 865 (Ariz. 1949)). "[W]here . . . the election has been held the will of the people there expressed by their vote should not be defeated." *Graham*, 125 Mont. at 432, 239 P.2d at 291 (citing *State ex rel. Kehoe v. Stromme*, 49 Mont. 25, 139 P. 1002 (1914); *State ex rel. Hay v. Alderson*, 49 Mont. 387, 142 P. 210 (1914), *overruled on other grounds by Marshall v. State*, 1999 MT 33, 293 Mont. 274, 975 P.2d 325; *Shekelton v. Toole County*, 97 Mont. 213, 33 P.2d 531 (1934)).

¶35 Courts in other states with initiatives and referenda have also held that an election terminates challenges to petitions. For example, in *Barkley*, the case cited with approval by this Court in *Graham*, the Supreme Court of Nebraska stated that the framers of that

15

state's constitution would never intend that a petition challenge could overturn a measure that has been approved by the electorate.

> If it be suggested that the vote should be had on the day named . . . then it might come to pass that the petitioners would be sustained by an overwhelming vote of the people, and yet the submission of the vote be set aside by a later decision of the court holding that the petition itself or the manner of its submission was insufficient. Constitution makers would never intend that.

*Barkley*, 169 N.W. at 732.

¶36     Some years later, in *Beene v. Hutto*, 96 S.W.2d 485, 488 (Ark. 1936), a case involving an initiative intended to fix the compensation, expenses and staff of certain county officials, the Arkansas Supreme Court declared:

> [A]fter a question is submitted to and voted upon by the people, the sufficiency of the petition is of no importance . . . because, whether sufficient or insufficient, if the measure is adopted by the people at the election, it becomes the law.

¶37     Similarly, the Nevada Supreme Court stated:

> Where resort to this court is had to prevent an issue from being presented for popular election and when such resort is tardily had without a showing of good cause for such lateness and when, due to such tardiness and the nature of the issues of law presented, orderly appellate consideration cannot be had without disruption of the process of election, this court will refuse determination of those issues on the merits.

*Beebe v. Koontz*, 302 P.2d 486, 489 (Nev. 1956).

¶38     In *Beebe*, petitioner sought writs of mandate and injunction to have a tax referendum omitted from the general election ballot for using the phrase "qualified electors" in the referendum petitions rather than the term "voter." The action was filed in the district court one month prior to the election. The district court issued its denial of

injunctive relief three days later and the notice of appeal was filed in the Supreme Court of Nevada on the same day. Oral argument in the matter was heard more than three weeks prior to the general election, yet the Supreme Court of Nevada declined to rule on the matter stating:

> The legal issues presented in these matters cannot be decided forthwith upon their merits. If such decision is to stand as law a careful consideration must be had of the many issues already mentioned.
> We can, then, foresee that in the course of orderly appellate consideration the judicial process itself may well render these issues of law moot prior to the announcement of our decision.
> Under these circumstances for this court to entertain this litigation further would amount to an unwarranted interference by the judicial department with the electoral franchise of the people of this state. Such interference, so far as the ensuing election is concerned, might well amount to a substantial destruction of that most important civil right.

*Beebe*, 302 P.2d at 490.

¶39 The same year the Supreme Court of Nevada issued its decision in *Beebe*, the Supreme Court of Missouri, in a case involving a declaratory judgment action attacking the constitutionality of Missouri's cigarette tax laws, cited with approval our decision in *Graham* and stated:

> As a general rule, after a legislative measure has been passed by the general assembly, approved by the voters on referendum and proclaimed by the governor to be in full force and effect as a law of the State of Missouri, the courts will not hold such act invalid because of procedural errors or defects occurring during the course of its adoption.

*Brown v. Morris*, 290 S.W.2d 160, 164 (Mo. 1956).

¶40 And, in *Renck v. Superior Court of Maricopa County*, 187 P.2d 656 (Ariz. 1947), the plaintiffs filed a lawsuit before election day challenging the sufficiency of an initiative petition. The election went forward while the suit was proceeding, and the

17

initiative was approved by the electorate. *Renck*, 187 P. 2d at 658. After the election, the Arizona Supreme Court issued an order terminating the judicial proceedings challenging the sufficiency of the initiative petition. *Renck*, 187 P.2d at 661. The court in *Renck* held that "[o]nce the measure has been placed upon the ballot, voted upon and adopted by a majority of the electors, the matter becomes political and is not subject to further judicial inquiry as to the legal sufficiency of the petition originating it." *Renck*, 187 P.2d at 661.

¶41  The *Renck* court also stated:

> If objections had been made in the early stages of the process of submission for the reasons now assigned, the questions would have been subjects of judicial investigation and determination . . . . Timely appeal to the courts upon the questions now raised, if meritorious, would have settled the matter *before the election was had*. However, the measure was submitted to the voters . . . . They were invited to believe that the formalities of the law pertaining to the submission of the measure had been fully met. The expense of the election was incurred, and the electors, imbued with the conviction that they were performing one of the highest functions of citizenship, and not going through a mere hollow form, we may assume, investigated the question and went to the polls and voted thereon.

*Renck*, 187 P.2d at 659 (quoting *Allen v. State*, 130 P. 1114, 1115 (Ariz. 1913) (emphasis in original).

¶42  In their reply brief in the case *sub judice*, Opponents claim that *Kromko v. Superior Court*, 811 P.2d 12 (Ariz. 1991), a later decision of the Supreme Court of Arizona, is contrary to the *Renck* decision because the appeal in *Kromko* was decided six months *after* the election was held. On the contrary, the Supreme Court of Arizona issued their *decision* in *Kromko before* the election was held. The court issued its formal written opinion explaining that decision after the election. *Kromko*, 811 P.2d at 15. In that opinion, the Supreme Court of Arizona stated that

18

disputes concerning election and petition matters must be initiated and heard in time to prepare the ballots for absentee voting to avoid rendering an action moot. We have long maintained that "if parties allow an election to proceed in violation of the law which prescribes the manner in which it shall be held, they may not, after the people have voted, then question the procedure."

*Kromko*, 811 P.2d at 18 (citations omitted).

¶43 And, finally, the Supreme Court of California recently explained that

once a measure has been placed on the ballot and has been voted upon by the electorate, California decisions have been most reluctant to overturn the results of an election on the basis of a procedural defect that has occurred at the petition-circulation stage of the process, inasmuch as such a defect ordinarily will have no effect on the material that is before the voters or on the fairness or accuracy of the election result.

*Costa v. Superior Court*, 128 P.3d 675, 685 (Cal. 2006) (citations omitted).

¶44 In the case before us on appeal, we agree with the observation presented by the State in its brief that although the proper application of Article III, Section 4(3), will result in the dismissal of Opponent's appeal, this does not mean that Opponents were without a remedy for their claims of defects in the petition-gathering process for I-151. Opponents could have directly challenged the Secretary of State's certification of I-151 based on illegal petition signatures starting July 12, when I-151 was certified for the ballot. *See* § 3-5-302(6)(b), MCA. Indeed, Opponents had precisely the same ability to timely challenge the signature-gathering process in I-151 as did the challengers of CI-97, CI-98 and I-154 in *Montanans for Justice*. Instead, Opponents waited until a few weeks before the election to file their Complaint, consequently, their appeal in this Court was not filed until the day before the election. Even though the Constitution requires that a preelection challenge "shall be given priority by the courts," Mont. Const. art. IV, § 7(2),

Opponents took a chance in filing their fact-intensive lawsuit in the District Court just one month before the election would supersede it, and their gamble failed when time for appellate review ran out.

¶45 The Dissent criticizes the District Judge for "improperly insert[ing] the due diligence requirement into § 3-5-302(6)(b), MCA," and failing to comply with the rules of statutory construction. In support of this argument, the Dissent relies on black-letter law—§ 1-2-101, MCA—for the proposition that in interpreting a statute a judge is "simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or omit what has been inserted." In further support, the Dissent relies on another rule of statutory construction—that we discern statutory intent by looking to the plain and ordinary meaning of the language contained in a statute. These rules are well-established and cited in cases too numerous to mention.

¶46 Similarly, in resolving disputes of constitutional construction, this Court applies the same rules of statutory construction when interpreting the Constitution; the framers' intent must first be determined from the plain language of the words used. *State ex rel. Racicot v. District Court*, 243 Mont. 379, 384, 794 P.2d 1180, 1183 (1990) (citing *Butte-Silver Bow Local Govern. v. State,* 235 Mont. 398, 404, 768 P.2d 327, 330 (1989)). Indeed, in *State ex rel. Cashmore v. Anderson*, 160 Mont. 175, 184, 500 P.2d 921, 926 (1972), *cert. denied by Burger v. Anderson*, 410 U.S. 931, 93 S.Ct. 1372 (1973), we stated:

> The rules of statutory construction are equally applicable to interpretation of the meaning of provisions in the Montana Constitution. In construing the meaning of a statute, the intent of the framers, i.e., the

20

legislature, is paramount. In determining legislative intent, resort must first be made to the plain meaning of the words used. In construing a statute the function of the court is simply to ascertain and declare what is in terms or substance contained therein, not to insert what has been omitted nor to omit what has been inserted. [Internal citations omitted.]

¶47 Moreover, where constitutional language is unambiguous and speaks for itself, our obligation is to interpret the language from the provision alone without resorting to extrinsic methods of interpretation. *Great Falls Tribune v. Public Schools*, 255 Mont. 125, 129, 841 P.2d 502, 504 (1992) (citing *Great Falls Tribune v. District Court, etc.*, 186 Mont. 433, 437-38, 608 P.2d 116, 119 (1980); *Associated Press v. Bd. of Public Educ.*, 246 Mont. 386, 391-92, 804 P.2d 376, 379 (1991)).

¶48 Here the language of Article III, Section 4(3), is unambiguous, plain and clear: "The sufficiency of the initiative petition shall not be questioned after the election is held." While this Opinion sets out the Constitutional Convention background of the adoption of this provision, the fact is, the language that the framers actually adopted contains a specific and unequivocal preclusion, "the sufficiency of the initiative petition *shall not be questioned after the election is held*" (emphasis added). Under our own well-settled rules of construction, we must interpret the substance of the plain words used by the framers, without insertion or omission of terms; and without resort to extrinsic methods or aids of interpretation.

¶49 Contrary to these rules, however, and based on its interpretation of the Constitutional Convention debates, the Dissent would ignore the plain language of Article III, Section 4(3), and, instead, add language to this constitutional provision: "The sufficiency of the initiative petition shall not be questioned after the election is held,

21

*except when the challenge was started before the election.*" Obviously, if the framers had wanted to qualify the language of Article III, Section 4(3), in the manner suggested by the Dissent, they could have done so. Just as obviously, they chose not to do so—the Dissent's interpretation of the debates to the contrary notwithstanding. This is why we are obligated, under our rules of construction, to render our interpretation on the plain language of statutes and constitutional provisions rather than on the statements and give-and-take of the legislators' or delegates' debates. The irony here is that the Dissent is doing to Article III, Section 4(3), precisely what it is criticizing the District Court for doing in interpreting § 3-5-302(6), MCA—adding language that is not there.

¶50 Finally, at ¶ 66, the Dissent takes issue with the Court's reliance on *Montanans for Justice* (Opinion, ¶ 33). The Dissent states that "the issue now before us could not have been raised in *Montanans for Justice* since our Opinion was issued on October 26, 2006, *prior* to the general election in November" (emphasis in original). While facially true, the statement is, at the same time, somewhat disingenuous. While the Opponents here, as noted above, could not have raised an Article III, Section 4(3), challenge pre-election, there was absolutely nothing stopping them from raising precisely the same petition-sufficiency challenges in enough time prior to the election so as to allow their challenge to be adjudicated in the District Court and then appealed to this Court—as did the plaintiffs in *Montanans for Justice*. The Opponents did not need to wait for our decision in *Montanans for Justice* to timely mount their own challenge on the same grounds. As observed by Chief Justice Gray:

22

Confrontation Clause arguments pursuant to the Sixth Amendment to the United States Constitution have been available since that Clause became applicable to the states via the Fourteenth Amendment. Equating the unavailability of a particular court decision to the unavailability of the Sixth Amendment argument simply enables counsel to neglect consideration of available constitutional challenges until such time as another lawyer has had the foresight to make such an argument in her or his case, and then piggyback onto the other lawyer's sound thinking and resulting success. I am not persuaded the Court is wise in encouraging such conduct by Montana lawyers in representing defendants in criminal cases.

*State v. Carter,* 2005 MT 87, ¶ 42, 326 Mont. 427, ¶ 42, 114 P.3d 1001, ¶ 42 (Gray, C.J., dissenting).

¶51 The Dissent's arguments to the contrary, there is nothing in the plain language of Article IV, Section 7(2), that nullifies the plain language of Article III, Section 4(3). Indeed, both constitutional provisions have been scrupulously followed here. The courts *did give* the Opponents' challenge priority. Because of their own lack of diligence in mounting their challenge in a timely manner, the Opponents simply did not begin their litigation in sufficient time to appeal the trial court's decision before the election. At that point, the unambiguous provisions of Article III, Section 4(3), became operative— thereafter the sufficiency of the initiative petition could "not be questioned after the election [was] held."

¶52 The Opponents had available to them the petition-sufficiency challenge from the start of signature gathering for I-151. The cases of both the plaintiffs in *Montanans for Justice* and the Opponents here were given priority. However, equating the unavailability of our decision in *Montanans for Justice* to the unavailability of the petition-sufficiency challenge simply enables the Opponents to neglect consideration of the challenge until

23

the Plaintiffs in *Montanans for Justice* had the foresight to successfully raise and litigate the challenge. We should not reward Opponents' attempt to piggyback on to the sound thinking and resulting success of the *Montanans for Justice* plaintiffs by re-writing the plain language of the Constitution so to save Opponents from their own lack of forethought and diligence.

¶53    Accordingly, we hold that Opponents' challenge to the sufficiency of the petitions for I-151 is rendered moot by Article III, Section 4(3) of the Montana Constitution.


/S/ JAMES C. NELSON


We concur:

/S/ PATRICIA COTTER
/S/ JOHN WARNER

Justice W. William Leaphart concurring.

¶54    I specially concur. I agree with the Court's conclusion that, since the electorate has now voted on this initiative, the sufficiency of the initiative petition cannot now be questioned, and this matter is moot under Article III, Section 4(3), of the Montana Constitution. However, I would not reach the question of mootness under the Constitution because I agree with the District Court's pre-election dismissal of this complaint as barred by the thirty-day limitations period set forth in § 3-5-302(6)(a), MCA.

¶55    The Opponents argue that § 3-5-302(6)(b), MCA, must be interpreted literally as allowing a contest to a ballot issue to be filed "at any time after discovery" of illegal petition signatures. Under a literal "at any time" interpretation, Opponents could challenge the initiative two months or five years after the election. Such a broad reading of the statute, however, would put it at odds with the clear language of Article III, Section 4(3), which states that: "The sufficiency of the initiative petition shall not be questioned after the election is held." Opponents suggest that the Constitution is satisfied so long as the challenge to the initiative is filed before the election, even if the court does not issue a decision until after the election. Such a procedure, however, would render Article III, Section 4(3), a nullity. As the Court correctly notes, Article III, Section 4(3), is designed to serve a purpose—i.e., to put an end to challenges and to honor the will of the majority of the voters once an election is held. Allowing a challenge to an initiative the day before the election, leaving the Court leeway to rule on the challenge two months or five years later, defeats the purpose of Article III, Section 4(3), just as effectively as allowing a

challenge to be filed a week after the election—a proposition which is clearly contra to Article III, Section 4(3). In both instances the sufficiency of the initiative petition is "questioned" after the election is held. Article III, Section 4(3), prohibits all post-election "questioning" of the sufficiency of the petition. This prohibition restricts both parties and *courts* from questioning the petition once the election is over. As the Court now holds, Article III, Section 4(3), requires that challenges to initiatives must not only be filed before the election, but must also be resolved before the election, or they become moot.

¶56    Interpreting § 3-5-302(6), MCA, in light of the above, the District Court was correct in reading subsection (a) as establishing a general rule that challenges have to be filed within thirty days of certification. The "at any time after discovery" language in subsection (b) is an exception to the general rule that comes into play only if the alleged illegality could not, with due diligence, be discovered within the initial thirty-day limitation. As the District Court pointed out, "under this statute, lack of knowledge does not extend the period of limitations and the period runs from the time that the facts constituting the claim could have been discovered in the exercise of due diligence." Here, although Opponents based their challenge on facts that were publicly available at the Secretary of State's office upon certification of the initiative, they did not file their challenge within thirty days of the Secretary of State's certification. Rather, they waited some eighty-three days to file their complaint. As the Court's Opinion points out, the Opponents here had the same opportunity to file a timely challenge to the initiative as did the challengers of CI-97, CI-98 and I-154 in *Montanans for Justice*. Without any basis for extending the thirty-day period of limitations, they waited well beyond the statutory

26

time limit to file their complaint. The District Court was correct in dismissing the complaint as untimely.

/S/ W. WILLIAM LEAPHART

Justice Brian Morris joins in the concurring opinion of Justice Leaphart.

/S/ BRIAN MORRIS

Chief Justice Karla M. Gray, dissenting.

¶57    I respectfully dissent from the Court's interpretation of Article III, Section 4(3) of the Montana Constitution as absolutely barring—and rendering moot—the final resolution of this case which began before the election was held on I-151.  Based on the plain language of the constitutional provision, together with the only relevant portion of the transcript from the 1972 Montana Constitutional Convention, I would hold that Article III, Section 4(3) does not bar the final resolution of this case.  In addition, I would reverse the District Court's legal interpretation of § 3-5-302(6)(b), MCA, and, therefore, its order granting summary judgment.  I would remand to the District Court for its post-trial findings of fact and conclusions of law on the underlying question in the action.

¶58    Article III, Section 4(3) provides that "[t]he sufficiency of the initiative petition shall not be questioned after the election is held."  It is undisputed that the present case involves "the sufficiency" of an initiative petition, rather than its substance.

¶59    Article III, Section 4(3)'s phrase "shall not be questioned" needs little interpretation.    It is clear, unambiguous and susceptible to only one rational interpretation.  The *American Heritage Dictionary* 1070 (New Coll. ed., Houghton Mifflin Co. 1982) defines "question" as "[a]n expression of inquiry that invites or calls for a reply[.]"  Similarly, *Black's Law Dictionary* 1259 (7th ed., West Group 1999) defines "question" as "[a]n issue in controversy; a matter to be determined."  Thus, pursuant to the plain meaning of the phrase, I conclude "shall not be questioned" means shall not be put into controversy or raised as a matter to be determined.

¶60    The nub of the issue before us, however, relates to Article III, Section 4(3)'s phrase "after the election is held," not the phrase "shall not be questioned." In this regard, it is appropriate to begin with Delegate Joyce's remarks during the 1972 Constitutional Convention. The Court faithfully reports Delegate Joyce's remarks, highlighting the portion stating that "this little sentence . . . —*would make it perfectly clear in the future that once the election is held, why, you can't challenge the sufficiency of the petitions.*" *See* Opinion, ¶ 29. Delegate Joyce's quoted remark—as well as those prior to this quoted portion—clearly reflect that his interest in adding the language now before us arose from an earlier case in which the sufficiency of petitions *had not* been challenged until "after the election was held." *See* Opinion, ¶ 29.

¶61    That is not the situation before us in this case. The facts here are that Montanans for Equal Application challenged—that is, raised a question about—the sufficiency of the I-151 petitions *before* the election was held. Delegate Joyce's remarks support an interpretation that a question regarding the sufficiency of an initiative petition must be raised—that is, filed in a court of competent jurisdiction—prior to the election on the substance of the petition. His remarks do not support the Court's interpretation of "after the election is held."

¶62    Nor does the *Graham* case, relied on by the Court, support its interpretation. As the Court correctly states, *Graham* is the case to which Delegate Joyce referred during the Constitutional Convention. In that 1951 case, the sufficiency of a petition was not challenged at all prior to the election. The only significance *Graham* has to the case now before us is Delegate Joyce's reliance on it in proposing the language that became Article

29

III, Section 4(3). Had Article III, Section 4(3) existed in 1951 at the time *Graham* was decided, the case presently before us would not have reached this Court. However, this constitutional language did *not* exist in 1951 and, as a consequence, the *Graham* Court looked to other jurisdictions which had ruled on related facts and issues. It is no longer necessary or appropriate to do so. For this Court now—in "interpreting" language which only came into existence more than 20 years after *Graham*—to attempt to rely on the same cases from other jurisdictions as the *Graham* Court relied on is somewhat disingenuous. *Graham* and the cases relied on therein have no relevance whatsoever to the present case and provide no basis for the Court's interpretation of the current constitutional language "after the election is held."

¶63 I am similarly unpersuaded by the Court's characterization of Delegate Etchart's statements during the Constitutional Convention, set forth in Opinion ¶ 27, as somehow supporting the result it reaches. The Court does not misquote Delegate Etchart. Importantly, however, the Court fails to take into account that Delegate Etchart's comments preceded Delegate Joyce's and properly can be relied on only in the context in which they were made.

¶64 The portion of the Constitutional Convention transcript immediately preceding Delegate Etchart's comments clearly establishes that the delegates were focused on Section 4 as proposed at that time. At the time of Delegate Etchart's comments, Section 4 read as follows:

> The people may enact laws by initiative in all matters except appropriations of money and local or special laws prohibited by this Constitution. The highway revenue provided for in Article blank, Section 6, shall nevertheless

30

be subject to appropriation by initiative. Initiative petitions must be signed by 5 percent or more of the legal voters in each of one-third or more of the legislative representative districts, and the total number of signers must be 5 percent or more of the total legal voters of the state. Each petition must contain the full text of the proposed measure. Petitions must be filed with the Secretary of State 4 months or more prior to the election at which they will be voted upon. The enacting clause of all initiative measures shall be: "Be it enacted by the people of the State of Montana."

*See* Montana Constitutional Convention, Verbatim Transcript, March 18, 1972, pp. 2695-96. Thus, Delegate Etchart's comments about preventing "frivolous legislative efforts by a small minority," and still allowing "serious popular measures to be initiated by the people[,]" clearly related only to provisions contained in that proposed version of Section 4 relating to the five percent of the voters and number of legislative districts. No nexus exists at all between Delegate Etchart's comments and the language later proposed by Delegate Joyce, ultimately adopted and now before us.

¶65 Article III, Section 4(3) prohibits challenges to the sufficiency of initiative petitions raised "after the election is held." Properly applied to the present case, the challenge raised on October 3, 2006, when Montanans for Equal Application filed its complaint in the District Court, is not barred by Article III, Section 4(3).

¶66 It strikes me that the closest the Court actually comes to addressing this issue is its reliance on statements from ¶ 31 of our recent opinion in *Montanans for Justice*. In my view, since the issue before us in the present case was not raised or briefed in the earlier case, the statements on which the Court relies are dicta in their entirety. Moreover, *Montanans for Justice*, ¶ 31, is merely the backdrop to our discussion of the issue actually before us there, namely, whether the party's due process rights had been violated

31

via a truncated period ordered by a district court for discovery and other pretrial processes after the timely filing of a challenge to the sufficiency of petitions on other initiatives. Indeed, the issue now before us could not have been raised in *Montanans for Justice* since our opinion was issued on October 26, 2006, *prior* to the general election in November. Therefore, *Montanans for Justice* is neither precedent nor persuasive authority for the Court's decision here.

¶67 Finally, it is critical to take note of Article IV, Section 7(2) of the Montana Constitution, which provides that "[a] preelection challenge to the procedure by which an initiative or referendum qualified for the ballot . . . shall be given priority by the courts." This constitutional provision clearly does not require that a final judicial determination on a preelection challenge must be completed prior to the election. Just as clearly, Article IV, Section 7(2) negates the Court's reliance on *Montanans for Justice* and the language therein for its determination that, absent a final preelection adjudication of a challenge to the sufficiency of a petition, judicial resolution of the case is barred and the question is rendered moot.

¶68 I would hold that Article III, Section 4(3) of the Montana Constitution does not bar—and does not render moot—the issue properly before us, which is whether the District Court erred in interpreting § 3-5-302(6), MCA, as barring Montanans for Equal Application's challenge to I-151. I turn now to that issue.

¶69 Defendant Raise Montana moved for summary judgment in the District Court contending that the complaint filed by Montanans for Equal Application was barred by the statute of limitations set forth in § 3-5-302(6)(a), MCA. Montanans for Equal

32

Application opposed the motion based on § 3-5-302(6)(b), MCA. The District Court determined no genuine issue of material fact existed with regard to the statute of limitations and granted summary judgment to Raise Montana. In my view, the District Court erred in interpreting the statutes.

¶70    Section 3-5-302(6)(a), MCA, provides:

> Except as provided in subsection (6)(b), a contest of a ballot issue submitted by initiative or referendum may be brought prior to the election only if it is filed within 30 days after the date on which the issue was certified to the governor . . . , and only for the following causes:
>         (i)  violation of the law relating to qualifications for inclusion on the ballot;
>         (ii)  constitutional defect in the substance of a proposed ballot issue; or
>         (iii) illegal petition signatures . . . .

Section 3-5-302(6)(b), MCA, provides that a "contest of a ballot issue based on subsection (6)(a)(i) or (6)(a)(iii) may be brought at any time after discovery of illegal petition signatures[.]"

¶71    It is undisputed that Montanans for Equal Application generally alleged illegal petition signatures pursuant to § 3-5-302(6)(a)(iii), MCA, and mentioned in § 3-5-302(6)(b), MCA. It also is undisputed that their complaint was not filed within the 30 days after the certification as generally required in § 3-5-302(6)(a), MCA. Thus, only the interpretation of the phrase "after discovery of illegal petition signatures" in § 3-5-302(6)(b), MCA, was before the District Court.

¶72    The District Court properly began its analysis by recognizing that a challenge based upon illegal signatures is exempt from the 30-day general limitation period set

33

forth in § 3-5-302(6)(a), MCA. It then properly turned to the word "discovery" contained in § 3-5-302(6)(b), MCA.

¶73 Thereafter, the District Court turned to § 27-2-102(2) and (3), MCA, the statute defining when a civil action is commenced, and imposed that statute's duty of due diligence onto the case before it. The District Court concluded that

> lack of knowledge does not extend the period of limitation and the period runs from the time that the facts constituting the claim could have been discovered in the exercise of due diligence.

Acknowledging that § 27-2-102, MCA, appears in the statute of limitations title of the Code, separate from the statute before it, the District Court further concluded that § 27-2-102, MCA, "enunciate[s] the legislative policy on the issue." In my view, the District Court erred.

¶74 I begin my analysis with the most basic rules of statutory construction. In interpreting a statute, a judge is "simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. We discern the Legislature's intent—whenever possible—by looking to the plain and ordinary meaning of the language contained in a statute. *See In re R.L.S.*, 1999 MT 34, ¶ 8, 293 Mont. 288, ¶ 8, 977 P.2d 967, ¶ 8 (citation omitted). Finally, more specific statutes prevail over general provisions of law. *Oster v. Valley County*, 2006 MT 180, ¶ 17, 333 Mont. 76, ¶ 17, 140 P.3d 1079, ¶ 17 (citation omitted). The District Court's interpretation fails to satisfy any of these rules of statutory construction.

¶75    It is my view that the District Court improperly inserted the due diligence requirement into § 3-5-302(6)(b), MCA, in violation of its § 1-2-101, MCA, obligation to not "insert what has been omitted." Section 3-5-302(6)(b), MCA, speaks only to "discovery." Similarly, the plain language of § 3-5-302(6)(b), MCA, extends the 30-day limitation period in § 3-5-302(6)(a), MCA, by allowing a ballot contest based on illegal petition signatures "after discovery" of such signatures. In my view, discovery means discovery. Here, Montanans for Equal Application discovered the allegedly illegal petition signatures after the 30-day limitation period and filed its complaint on October 3, 2006. The plain meaning of § 3-5-302(6)(a) and (b), MCA, requires nothing more insofar as the facts of the present case are concerned.

¶76    Finally, it surely must be beyond cavil that § 3-5-302, MCA, is a specific statute which vests original jurisdiction of certain causes of action in Montana's district courts. Among those are preelection contests of ballot issues for which very explicit provision is made. Section 27-2-102, MCA, on the other hand, is contained in the chapter of Title 27, MCA, addressing statutes of limitations broadly and, indeed, § 27-2-102, MCA, is within Part 1 of that chapter, headed "General Provisions." The statute itself is captioned "[w]hen action commenced." Moreover, § 27-2-102(2), MCA, sets out the "[l]ack of knowledge . . . does not postpone the beginning of the period of limitation" part of the discovery "duty" imposed on Montanans for Equal Application by the District Court. Interestingly, subsection 2 begins "[u]nless otherwise provided by statute." Section 3-5-302(6)(b), MCA, the more specific statute, provides otherwise.

35

¶77 It is important for me to be clear, in closing, that Article III, Section 4(3) of the Montana Constitution clearly and unambiguously prohibits a challenge to the sufficiency of a petition filed after the election is held.

¶78 In summary, I dissent from the Court's interpretation of Article III, Section 4(3), and would allow this case to proceed to resolution. I would hold that the District Court erred in interpreting § 3-5-302, MCA, and remand to that court for the entry of findings of fact, conclusions of law and judgment on the underlying question.

/S/ KARLA M. GRAY

Justice Jim Rice joins in the foregoing dissenting Opinion of Chief Justice Karla M. Gray.

/S/ JIM RICE