JUSTICE NELSON,
concurring in the result but dissenting from the reasoning.
¶28 I agree with the Court that the complaint against Not Afraid must be dismissed, but I strongly disagree with the Court’s rationale.
I. Jurisdiction
|¶29 The most fundamental problem with this case is evident from its (caption: Inquiry Concerning Complaint of: Judicial Standards ICommission v. Leroy Not Afraid. While the Court correctly observes Sthat questions of jurisdiction may be raised at any time, Opinion, P 10-indeed, courts have an ‘independent obligation” to determine Ivhether jurisdiction exists, even in the absence of a challenge from bny party, see Stanley v. Lemire, 2006 MT 304, ¶¶ 30-32, 334 Mont. 489, 148 P.3d 643-and while the Court then addresses the question of Ivhether the Judicial Standards Commission (JSC) is interfering with tribal sovereignty or self-governance, Opinion, ¶¶ 11-12, the Court Inexplicably ignores the threshold question of whether the JSC has authority to file complaints against judicial officers on its own motion. ■The Court does not address this important issue directly but, rather, *544 in a footnote containing no analysis, cites a JSC rule and a prior decision of this Court as support for the JSC’s action. Opinion, ¶ 4 n. 1. Neither of these, however, is valid authority for the JSC to proceed as it has in this matter; and, in fact, I conclude that the JSC does not have such authority.
¶30 The JSC is established by the Montana Constitution, and its power and authority are delineated by the Constitution. In particular, ‘Tt]he commission shall investigate complaints, and make rules implementing this section. It may subpoena witnesses and documents.” Mont. Const, art. VII, § 11(2) (emphasis added). Significantly, this provision does not grant the JSC authority to commence investigations into any matter it deems interesting or worrisome. It says, rather, that the JSC shall investigate “complaints.” The implication of this language is that the JSC does not act on its own motion but, rather, acts only pursuant to a “complaint”brought by someone other than the JSC itself.
¶31 This interpretation is supported by the statutes implementing Article VII, Section 11. Section 3-l-1106(l)(a), MCA, states:
The commission, upon the filing of a written complaint by any\ citizen of the state, may initiate an investigation of any judicia officer in the state to determine if there are grounds fo: conducting additional proceedings before the commission. If tb commission’s investigation indicates that additional proceeding; before the commission may be justified, the commission shal' require the citizen who filed the original written complaint to sij a verified written complaint before conducting additional proceedings. [Emphases added.]
Likewise, subsection (l)(b) states:
The commission shall give the judicial officer written notice o: the citizen’s complaint and of the initiation of an investigation! Notice must also be given if a verified written complaint is file' and must include the charges made, the grounds for the charges) and a statement that the judicial officer may file an answer. Thi notice must be signed by the commission. [Emphases added.]
Also, § 3-l-1126(l)(a), MCA, directs the JSC, in its reports to thi Legislature, to identify “each complaint, whether or not verified] received by the commission” (emphasis added). There is no suggestio: that complaints may be filed by the JSC itself. To the contrary, thes provisions recognize only complaints filed by citizens.
¶32 This interpretation of Article VII, Section 11(2) is also supportej by the comments of the 1972 Constitutional Convention delegate Delegate Aronow observed that
*545 this article provides for three district judges, one lawyer and one layman, a committee of five, to investigate and look into any complaints that are made or any information that comes to the attention of the commission that a judge, either because of old age, other disability, is not attending to duties properly and provide for his retirement or removal from office.
Montana Constitutional Convention, Verbatim Transcript, Feb. 29, 1972, p. 1123.[1] Delegate Aronow further explained that
we’ve never had a commission of this type to which a practicing lawyer could go. The only way that you can get rid of a judge was through impeachment or wait until the next election and try to get somebody to run against him. This is a procedure where a letter can be written or a charge filed with this commission and ask them to look into it, investigate it, and, if the facts were found to be true, then to take such action as [they] might deem appropriate.
Id. at 1126 (emphasis added).
133 Likewise, Delegate Berg noted that
[w]e are particularly interested in seeing to it that District judges and Supreme Court justices have some protection, not only of themselves in the case of senility or alcoholism, but frequently charges are made against judges which, of course, they are almost powerless to answer. If there is a commission before whom those charges can be filed, the judge has an opportunity to defend himself.
d. at 1125.
¶34 The delegates contemplated that the JSC’s proceedings would be t the behest of an aggrieved citizen. Indeed, it is notable that the elegates adopted the current language of Article VII, Section l(2)wvhich, as noted, grants the JSC authority to ‘investigate omplaints”-over language that would have granted the JSC “the ower to investigate . . . upon complaint by any citizen or on its own lotion.” See id. at 1122 (emphasis added). Section 3-1-1106(1), MCA, irrespondingly, refers to a complaint filed by a citizen, not by the JSC i its own motion.
■35 In the present case, however, the official record filed with the Blerk of the Supreme Court in Case No. PR 09-0639 does not contain ■written complaint by a citizen-let alone a verified -written complaint *546 by a citizen. Rather, the so-called ‘Formal Complaint” upon which this action is premised was filed by the JSC itself. To be sure, it was signed by an individual (Geoffrey R. Keller). But Keller signed in his capacity as ‘Prosecuting Attorney,” and the first paragraph of the complaint states that Keller was “appointed by the Judicial Standards Commission” and is proceeding “on behalf of’the “Judicial Standards Commission,” which is the named ‘Complainant.” In other words, the JSC hired Keller as prosecutor and then directed him to file, in the JSC’s name, the complaint against Not Afraid, which the JSC ther heard and decided.[2]
¶36 While not a matter of record, it appears that the JSC’s action wai prompted by an unverified letter from the Commission on Courts o: Limited Jurisdiction (COCLJ) dated May 5,2009 and addressed to the Chief Justice and myself, with copies to Not Afraid and the JSC. Thii letter was intended to “notify! ]” this Court and the JSC of “an issue that may result in the disqualification of a sitting Justice of th< Peace.”[3] It is doubtful that this letter qualifies as a citizen complain filed with the JSC. But assuming, for the sake of argument, that it i: §3-1-1106, MCA, required the JSC to follow these steps:
1. Upon the filing of the written complaint, initiate ai investigation to determine if there are grounds for conductin additional proceedings.
2. If the investigation indicates that additional proceedings maj be justified, then “require the citizen who filed the origin; written complaint to sign a verified written complaint befo: conducting additional proceedings.”
3. After an investigation, and upon a finding of good cause, do an| of the following: (a) order a hearing to be held before the JS concerning the censure, suspension, removal, or retirement of t' judicial officer; (b) confidentially advise the judicial officer a: this Court that the complaint will be dismissed if the judici officer files a letter stating that he or she will take correcthl action satisfactory to the JSC; or (c) request that this Couj appoint one or more special masters to hear and take evidem and to report to the JSC.
*547 4. If after a hearing or after considering the record and the report of the masters the JSC finds the charges true, then recommend to this Court the censure, suspension, removal, or disability retirement of the judicial officer.
¶37 Again, assuming the COCLJ letter constituted a citizen complaint, the JSC was permitted to initiate an investigation to determine whether grounds existed to conduct additional proceedings. If such grounds existed, the JSC was required to obtain a verified written complaint before conducting the additional proceedings. According to the record filed in this case, however, that procedure was not followed. There is no verified written complaint by a citizen. Rather, the JSC proceeded based solely on its own complaint against Not Afraid. The JSC held a hearing on the complaint in June 2010 (step 3(a) above) and filed a recommendation with this Court in August 2010 (step 4) that Not Afraid receive a public reprimand. Basically, everything the JSC did after receiving the letter and completing a preliminary investigation (step 1) was unlawful.
¶38 There is no authority for the JSC to charge, hear, and then adjudicate the merits of its own complaint. That approach is contrary ¡to the intent of Article VII, Section 11(2) and the dictates of §3-1-1106, MCA. The JSC in this case has plainly overstepped its authority. Moreover, I note that this procedure-under which the JSC has anointed itself complainant, investigator, and adjudicator-raises the same concerns which prompted this Court to enact structural changes to the Commission on Practice. See Goldstein v. Commn. on Practice of the Supreme Court, 2000 MT 8, 297 Mont. 493, 995 P.2d 923; In re Creation of Office of Discipline Counsel, 2001 MT 257, 307 Mont. 210, 153 P.3d 861. These structural changes included separating the Investigative authority, the reviewing authority, the charging (authority, and the adjudicatory authority so that all four are not conducted by the same individuals. But here, in contrast, all four of these functions were conducted by the same members of the JSC. Burely judges who are subject to discipline are entitled to the same due process rights as those enjoyed by attorneys who are subject to discipline. As perhaps the most basic component of due process, Not |\fraid had the right to be judged by an impartial tribunal, not by the pery body that filed the charges against him. See Goldstein, ¶ 64 iNelson, Leaphart, & Trieweiler, JJ., dissenting). As James Madison Ibserved, ‘No man is allowed to be a judge in his own cause, because ids interest would certainly bias his judgment, and, not improbably, iorrupt his integrity. With equal, nay with greater reason, a body of Bien are unfit to be both judges and parties at the same time ....” The *548 Federalist No. 10, at 79 (C. Rossiter ed. 1961).
¶39 The Court does not deny that the constitutional and statutory requisites for the JSC’s proceedings were not met in this case. Rather, in a footnote, the Court merely cites to the JSC’s Rule 10(b) and our decision in State ex rel. Smartt v. Jud. Stands. Commn., 2002 MT 148, ¶ 30, 310 Mont. 295, 50 P.3d 150, as support for the JSC’s action here. Opinion, ¶ 4 n. 1. Yet, as stated at the outset, neither of these is valid authority for the JSC to initiate formal proceedings on its own complaint.
¶40 First, Smartt is distinguishable on its facts in that the proceedings there were initiated at the behest of a citizen (Samuel Harris) who filed first an unverified complaint, and later a verified complaint, against Smartt with the JSC. See Smartt, ¶¶ 5, 21. Notably, the JSC conceded that the First Judicial District Court Vas correct to enjoin the Commission from instituting formal proceedings [against Smartt] before it had obtained a verified complaint [from Harris].” Smartt, ¶ 15.
¶41 Furthermore, the question under consideration in ¶ 30 of Smart\ was whether the JSC had overstepped its authority by investigation allegations which had come to the JSC’s attention in the course o: investigating Harris’s complaint and which had been leveled by different individual who had not filed a complaint with the JSC. Se> Smartt, ¶¶ 5, 22. We stated that the JSC may act on its own motion and in the absence of a verified complaint, to investigate allege judicial misconduct based upon information otherwise received) Smartt, ¶¶ 29-30. Yet, although I signed our opinion in Smartt, upo: further research I cannot agree with the proposition that the JSC ma; file charges against a judge or justice on its own motion and then sij in judgment of its own case. That is not what the delegates had i: mind; indeed, as noted, they declined to adopt language that woul have granted the JSC “the power to investigate ... on its own motion.] Also, it is not what the applicable statutes say.
¶42 In this regard, this Court has held that the JSC may not adopl rules which conflict with the statutory provisions implementing Articl) VII, Section 11. State ex rel. Shea v. Jud. Stands. Commn., 198 Mon 15, 30-34, 643 P.2d 210, 218-20 (1982). At issue in Shea were charg against then-Justice Shea arising out of (1) an unverified letter fro: a retired district judge alleging that automobiles registered in thj name of Justice Shea’s wife had accumulated 60 unpaid parki: tickets and (2) an unverified complaint by the JSC itself that Justi Shea had used ‘intemperate” language in a dissenting opinion. See i at 19-20,30-32,643 P.2d at 212-13,218-19. As authority for proceedinl *549 without a verified complaint, the JSC had relied on its Rule 9(b), which stated: ‘The commission, without receiving a verified statement, may make such a preliminary investigation on its own motion.” Id. at 24, 643 P.2d at 215. We held this rule invalid, however, because it conflicted with the statutory requirement (under §3-1-1106(1), MCA) that the JSC’s investigations be conducted pursuant to a “verified written complaint.” Id. at 31, 643 P.2d at 219. We observed that the JSC, in proceeding under Rule 9(b), was
assuming unto itself the right to ignore legislatively enacted provisions governing its procedure, and even its own rule requiring a verified complaint, in its perception and under the assumption that it is now acting and will act for the public good. The question, however, is not one of motives but of constitutional authority, for which the best of motives is not a substitute.
Id. at 32, 643 P.2d at 219. We concluded that the JSC was powerless to set aside the statutory requirement that it proceed against judicial officers only by verified written complaint-Rule 9(b) and the JSC’s rulemaking authority notwithstanding. Id. at 34, 643 P.2d at 220. ¶43 It should be noted here that at the time we decided Shea, § 3-1-1106(1), MCA, contemplated that the JSC could initiate an investigation by filing its own verified written complaint. The statute provided: “The commission or any citizen of the state may, upon good cause shown, initiate an investigation of any judicial officer in the state by filing a verified written complaint with the commission.” Section 3-1-1106(1), MCA (1981) (emphasis added). But in 1983, the Legislature revoked that authority, requiring instead that a complaint be filed by a citizen. The revised statute provided (and still provides):
The commission, upon the filing of a written complaint hy any citizen of the state, may initiate an investigation of any judicial officer in the state to determine if there are grounds for conducting additional proceedings before the commission. If the commission’s investigation indicates that additional proceedings before the commission may be justified, the commission shall require the citizen who filed the original written complaint to sign a verified written complaint before conducting additional proceedings.
Ejection 3-l-1106(l)(a), MCA (1983 & 2009) (emphases added). This is lurther evidence that the JSC has no authority to commence proceedings against a judge or justice on its own complaint.
B44 This Court was unanimous in Shea with respect to Issue 3, where She Court held that a verified written complaint is a requisite for JSC proceedings, despite the JSC’s attempt through Rule 9(b) to expand its *550 authority to conduct investigations in the absence of such a complaint. Justice Sheehy authored the opinion of the Court, in which Justices Daly and Morrison concurred; and Justice Weber, through a special concurrence, provided the essential fourth vote as to Issue 3. See Shea, 198 Mont. at 40, 643 P.2d at 224 (Weber, J., specially concurring). Significantly, however, Justice Weber did not join Justice Sheehy s opinion as to Issue 4, thus making that part of the decision a plurality. Under Issue 4, Justice Sheehy considered whether the charges made against Justice Shea, relating to unpaid parking tickets and ‘intemperate” language in a dissenting opinion, constituted “willful misconduct in office.” See id. at 34-39, 643 P.2d at 220-23 (plurality opinion). He concluded that they did not amount to “willful misconduct in office” and that the JSC, therefore, had acted ‘in excess of its jurisdiction” by pursuing these charges. Id. at 39, 643 P.2d at 223. Justice Weber, however, noted that it was unnecessary to reach Issue 4 given the threshold determination under Issue 3 that the proceedings against Justice Shea were barred due to the lack of a verified complaint. See id. at 40-41, 643 P.2d at 224 (special concurrence).
¶45 The significance of Justice Weber’s vote was overlooked by the Court in Smartt. We asserted that the Shea Court “did not issue the writ of prohibition solely because the Commission proceeded agains' Justice Shea without the statutorily required verified complaint, but, rather, primarily because the Commission exceeded its jurisdiction in| investigating a charge that did not amount to ‘misconduct in office. Smartt, ¶ 17. This is a complete misstatement of the Shea decision. The fact is that the writ of prohibition did issue solely because the JS1 proceeded against Justice Shea without the statutorily require^ verified complaint. That was the one-and only-ground that commanded a majority of the Court. Only a plurality reached th< conclusion that the JSC had also exceeded its jurisdiction b; investigating charges that did not amount to “misconduct in office,’! and the entire discussion under Issue 4 of Shea was, therefore, dictaj
¶46 For the foregoing reasons, the suggestions in Smartt that the JS' may initiate an investigation and file charges on its own motion am that we did not squarely hold to the contrary in Shea are simply wron; and should be overruled.
¶47 As a final matter, the Court notes that the JSC adopted Rule 10( pursuant to authority granted by Article VII, Section 11(2) an| § 3-1-1105(2), MCA. The former authorizes the JSC to “investigat< complaints, and make rules implementing this section,” while thj latter states that the JSC “shall make rules for the conduct of i *551 affairs and the enforcement of confidentiality consistent with this part.”Yet, the authority to make rules is not also authority for the JSC to delineate or expand its own jurisdiction. In this regard, it should not be forgotten that jurisdiction is conferred “only by the Constitution or statutes adopted pursuant to the Constitution” and that administrative rules are not a source of jurisdiction. Pinnow v. Mont. State Fund, 2007 MT 332, ¶¶ 20-23, 340 Mont. 217, 172 P.3d 1273. Furthermore, for the reasons just discussed, the JSC may not, through its rulemaking authority, ignore legislatively enacted provisions setting forth the requisites for JSC proceedings. Shea, 198 Mont. at 32-34, 643 P.2d at 219-20. Those provisions require that JSC proceedings be founded upon the verified written complaint of a citizen. Any statutory authority the JSC may have had to proceed on its own motion-assuming such authority was valid in the first place-was revoked in 1983 with the amendments to §3-1-1106, MCA. Regardless of how much power and authority the JSC has purported to confer unto itself under Rule 10(b), the JSC’s jurisdiction is constrained by the Constitution and statutes adopted pursuant to the Constitution, and those provisions authorize the JSC to act only upon citizen complaints.
1148 Accordingly, the JSC’s action here is legally unfounded, and I cannot agree with the Court’s ratification of it. The JSC has no luthority to charge, hear, and adjudicate the merits of its own complaint. The JSC may proceed against a judicial officer only by the rerified written complaint of a citizen. I thus would hold that the JSC tad no jurisdiction over this action, and I would dismiss the JSC’s omplaint on this basis.[4]
II. ‘Elective Public Office”
49 Because the Court has proceeded to analyze the merits of the SC’s complaint against Not Afraid, I will explain my disagreement rith the Court’s analysis.
50 First, the Court’s entire discussion commencing at ¶ 17 and Dncluding at ¶ 26 is premised on the notion that Article VII, Section 0 is ambiguous. (As the Court concedes, if a provision is nambiguous, we simply apply the provision according to the plain *552 meaning of its words and do not resort to extrinsic sources as the Court does here. Opinion, ¶ 15; see also State v. Turbiville, 2003 MT 340, ¶ 21, 318 Mont. 451, 81 P.3d 475.) The Court’s premise, however, is wrong.
¶51 Article VII, Section 10 states: “Any holder of a judicial position forfeits that position by either filing for an elective public office othei than a judicial position or absenting himself from the state for more than 60 consecutive days.” The term at issue is “elective public office.” These words have a plain and unambiguous meaning.
¶52 A “public office”is “[a] position whose occupant has legal authority to exercise a government’s sovereign powers for a fixed periodBlack’i Law Dictionary 1351 (Bryan A. Gamer ed., 9th ed., Thomson Reuters 2009). This, in substance, is the same definition of “public office” that existed when Article VII, Section 10 was adopted. See Black’s Lau Dictionary 1235 (rev. 4th ed., West 1968) (‘The right, authority, anc duty created and conferred by law, by which for a given period ... ai individual is invested with some portion of the sovereign functions o government for the benefit of the public.’). Likewise, this Court ha; recognized that “the creation and conferring of an office involves ; delegation to the individual of some of the sovereign functions government, to be exercised by him for the benefit of the public.” Stat ex rel. Running v. Jacobson, 140 Mont. 221, 225, 370 P.2d 483, 48 (1962) (internal quotation marks omitted); see also State ex rel. Barne, v. Hawkins, 79 Mont. 506, 515-29, 257 P. 411, 413-18 (192 (explaining that ‘jpublic office” involves the exercise of some portion o the sovereign power of the government). Thus, we have held th neither a law clerk nor a district court master is a “public officei because those individuals do not exercise “sovereign power” o “sovereign judicial authority.” State ex rel. Baugh v. Bradley, 231 Mon 46, 52, 753 P.2d 857, 861 (1988). Even the test cited by the Court ¶ 21 recognizes that a “public office” is a position that involves thj exercise of a government’s sovereign powers:
1. The position must be created by the constitution, by ti legislature, or through authority conferred by the legislature
2. It must possess a delegation of a portion of the sovereign powi of government, to be exercised for the benefit of the public.
3. The powers conferred, and the duties to be discharged, must defined, directly or impliedly, by the legislature or throuj legislative authority.
4. The duties must be performed independently and withoj control of a superior power, other than the law (with exceptio not applicable here).
*553 5. It must have some permanency and continuity and not be only temporary or occasional.
See Forty-Second Legislative Assembly v. Lennon, 156 Mont. 416, 422-23, 481 P.2d 330, 333-34 (1971) (citing Barney, 79 Mont. at 528-29, 257 P. at 418). The Barney Court synthesized this five-prong test from various non-Montana authorities. See Barney, 79 Mont. at 515-29, 257 P. at 413-18.
¶53 Here, the position of Crow Tribal Chairman clearly meets the definition of “public office.” The position is created by the Crow Constitution under Article IV of that document (‘Executive Branch of Government”). The position possesses a delegation of a portion of the sovereign power of the Crow tribal government to be exercised for the benefit of the public. The powers and duties of the position are defined in Article IV-thus eliminating the need for definition by the tribal legislature. See Barney, 79 Mont. at 523, 257 P. at 416 (stating the inquiry simply as, “Are his duties prescribed by law?”-not necessarily ‘by the legislature”). The duties are performed independently and without control of a superior power other than the law. And the constitutionally created position has permanency and continuity. There can be no doubt that Crow Tribal Chairman is a ‘^public office.”
¶54 The Court asserts that the first and third elements of the five-prong test are not met here because the position of Crow Tribal Chairman ‘is not created by the Montana Constitution nor by the Legislature” and the powers and duties of the position “are not directly or impliedly defined by the Montana Legislature.” Opinion, ¶ 22. But these observations miss the mark. The fact that the position is not created by the Montana Constitution or the Montana Legislature and the fact that its powers and duties are not defined by the Montana Legislature establish nothing except that the position is not a “public office” of this state. That is not the relevant question, however. The juestion, rather, is whether the position is a “public that is what the constitutional language says, d, for the reasons just discussed, it plainly is a “public office”-albeit, i created by a different sovereign, but no less a “public office.”
5 Next, is the position “elective’? An “elective office” is ‘ta]n office it is filled by popular election rather than by appointment.” Black’s w Dictionary 596 (9th ed.); accord Black’s Law Dictionary 610 (rev. l ed.) (‘One which is to be filled by popular election. One filled by the ect exercise of the voters’ franchise.”). Here, Article IV, Section 1 of ! Crow Constitution states that the position of Tribal Chairman all be elected by the qualified voters.” Thus, there can be no doubt it the position of Crow Tribal Chairman is an “elective public office.” *554 Article VII, Section 10 of the Montana Constitution states that a holder of a judicial position forfeits that position by ‘filing for an elective public office other than a judicial position.” Not Afraid filed for an “elective public office” that was an executive position. Hence, he forfeited his judicial position.
¶56 The Court circumvents this plain-meaning interpretation of the unambiguous constitutional language by manufacturing an ambiguity where there is none. The Court asserts that Article VII, Section 10 is ambiguous-thus justifying resort to extrinsic sources-because it does not expressly state whether it applies to an “elective public office” of another sovereign. Opinion, ¶ 16. I disagree with this ‘failure by omission” approach. We can always criticize a statute or constitutional provision for using a general term in lieu of listing every specific object to which the provision is intended to apply. But that does not make the general provision ambiguous; it simply makes the provision broad and nonexclusive. This issue came up during the 1972 Constitutional Convention with respect to the jurisdiction of the district courts. The 1889 Constitution articulated a laundry list of cases and writs ovei which the district courts had jurisdiction. However, the delegates eschewed that approach in favor of general language so as not to imply that any cases or writs not specifically identified in the constitutiona' provision were excluded from the district courts’ authority. Compan Mont. Const, art. VIII, §11 (1889), with Mont. Const, art. VII, §4(1)] (1972).[5]
¶57 Likewise here, the language is general: Any holder of a judicial position forfeits that position by filing for “an elective public offio other than a judicial position.” The delegates chose this broad *555 nonexclusive, and unqualified language. It thus was not necessary for them to state that the term “elective public office” includes elective public offices “of another sovereign.” If anything, they should have qualified the language which they actually used if they intended for it to be limited to “elective public offices of this state.'” Indeed, had they wanted to limit the scope of “elective public office” to state offices, they certainly could have included the “of the state” language which the Court wrongly inserts into Article VII, Section 10. See Opinion, ¶ 25 (asserting that “tribal offices are creations of another sovereign and not considered public offices of the state”~even though “of the state” is not part of Article VII, Section 10’s language (emphasis added)).
¶58 In short, although constitutional language “should be given its natural or ordinary meaning,” Opinion, ¶ 16, the Court fails to abide by this directive and instead inserts words (“of the state”) that do not appear in Article VII, Section 10. This approach violates Montana’s blackletter law-§ 1-2-101, MCA [6]wvhich is so often invoked by every member of this Court that it would be silly to provide pages of string-cites for the principle. The Court errs in reading into the Constitution language that is not there.
¶59 Lastly, I do not believe the extrinsic sources cited by the Court support its ultimate construction of Article VII, Section 10. First, with regard to the January 29, 2003 hearing on HB 190, the Court in effect attributes constitutional significance to the remarks made in response to a question about the scope of a proposed statute. Opinion, ¶ 19. This approach sets bad precedent, not only because the remarks had absolutely nothing to do with the meaning of Article VII, Section 10, but most fundamentally because it is the province and duty of the judiciary, not speakers at legislative hearings, to interpret the Constitution and say what the law is. Marbury v. Madison, 5 U.S. 137, 177 (1803); Mont. Petroleum Tank Release Comp. Bd. v. Crumleys, Inc., 2008 MT 2, ¶ 57, 341 Mont. 33, 174 P.3d 948.
¶60 Likewise, I do not find the Title 13 election statutes cited by the Court to be of any persuasive value. The Court considers it “notabl[e]” that tribal offices are missing from the definition of “public office” in § 13-1-101(28), MCA, which states: “ ‘Public office’ means a state, county, municipal, school, or other district office that is filled by the *556 people at an election.” Opinion, ¶ 19. I find this, however, to be quite unsurprising. The Legislature does not dictate the procedures for electing candidates to tribal offices-a point the Court makes in ¶ 12-and thus there would be no reason for the Legislature to include tribal offices in the definition of “public offices” in Title 13. Title 13, after all, sets forth the procedures for electing candidates to state offices, not tribal offices. Moreover, Title 13 does not purport to implement Article VII, Section 10, and thus its definition of “public office” affords no insight whatsoever. [7]
¶61 On the other hand, the Attorney General has opined-in a 1991 decision which focused on a different issue-that §3-1-607 and -608, MCA, are implementing statutes for Article VII, Section 10. Opinion, ¶ 18. Yet, I am aware of no occasion on which the Attorney General has opined that these statutes fully implement the constitutional provision; and the language of the statutes themselves indicates that they do not purport to do so, but rather are directed at three specific state judicial offices.
¶62 To summarize, then, the Court takes unambiguous constitutional language, manufactures an ambiguity, and then uses extrinsic sources of limited or no probative value to rewrite the constitutional language-in violation of the canons of construction-from “an elective public office other than a judicial position” to “an elective public office of the state other than a judicial position.” I strongly dissent from this approach and from the Court’s corresponding conclusion that Crow Tribal Chairman is not an “elective public office” under Article VII, Section 10.
III. ‘Forfeits”
¶63 Having concluded under the foregoing analysis that Not Afraid! filed for “an elective public office other than a judicial position,” the j question arises as to what consequences flow from this action. I
¶64 As noted, Article VII, Section 10 states that the holder of a judicial! position ‘forfeits that position” either by filing for an elective public I office other than a judicial position or by absenting himself from the! state for more than 60 consecutive days. This language is both! mandatory and prohibitory. It dictates that forfeiture occurs upon! *557 either of the two stated events. Correspondingly, it deprives the officeholder of his or her power to act in a judicial capacity. As Delegate Dahood observed during the Constitutional Convention:
[Constitutions are based on the premise that they are presumed to be self-executing, particularly within the Bill of Rights. If the language appears to be prohibitory and mandatory,... then in that event, the courts in interpreting the particular section are bound by that particular presumption and they must assume, in that situation, that it is self-executing.
Montana Constitutional Convention, Verbatim Transcript, Mar. 7, 1972, p. 1644. Thus, once it is clear that either of the two events described in Article VII, Section 10 has occurred, then forfeiture of the judicial position is automatic.
¶65 We interpreted this language in one case, Comm. for an Effective Judiciary v. State, 209 Mont. 105, 679 P.2d 1223 (1984), where we held unconstitutional two statutes which, in direct contradiction to the language of Article VII, Section 10, required a district court judge or a Supreme Court justice to resign from his or her office in order to run for any elective office under the laws of Montana, including another judicial position. Importantly, for purposes of the present discussion, we stated:
The judicial article is clearly the most restrictive-it imposes severe sanctions on office-seeking by judicial office holders. Any judge holding office in this state forfeits his office if he files for any office-1' other than a judicial position.” (Art. VII, §10, supra.) Though it does not mention filing for a legislative or an executive office, the crystal clear message of this provision requires a judge to forfeit his judicial office if he files for either a legislative or an executive office.
Comm. for an Effective Judiciary, 209 Mont. at 115, 679 P.2d at 1228 (first emphasis in original, second emphasis added).
¶66 Our determination that a judge forfeits his judicial office if he files for an executive office is in accord with the intent of the delegates, as evidenced by the following exchange which occurred when Article VII, Section 10 was recommended for adoption as it is now written:
CHAIRMAN GRAYBILL: I take it that this means that he’s-he forfeits if he does either of these two things which were contained in two separate paragraphs above; namely, files for another elective office or absents himself for 60 days. Is that right?
DELEGATE SCHILTZ: That’s right.
Montana Constitutional Convention, Verbatim Transcript, Mar. 13, *558 1972, p. 2187.
¶67 Thus, it is clear from the plain language of Article VII, Section 10, as confirmed by the delegates’ comments, and from our interpretation of this language in Comm, for an Effective Judiciary that when a judge files for a nonjudicial elective public office, the judge forfeits his judicial position. That is precisely what the Constitution says.
¶68 To ‘forfeit” means “to lose or lose the right to by some error, offense, or crime.” Merriam-Webster’s Collegiate Dictionary 457 (10th ed., Merriam-Webster 1997). ‘Forfeiture” has a well-understood meaning in the law. It involves “[t]he loss of a right, privilege, or property because of a crime, breach of obligation, or neglect of duty.” Black’s Law Dictionary 722 (9th ed.). In other words, forfeiture means that a person loses a right or privilege as a consequence of having done or omitted to do an act. It is a divestment as a consequence of default or offense; a loss by reason of misdeed or transgression. In the usual context, forfeiture occurs simultaneously with the act, error, omission, or violation of the condition precedent. Examples of these principles appear repeatedly in our cases. See e.g. State v. Riggs, 2005 MT 124, ¶ 45, 327 Mont. 196, 113 P.3d 281 (juror might have to forfeit airline tickets that he held for a flight which was scheduled to depart the following morning); State v. Sanchez, 2008 MT 27, ¶ 47, 341 Mont. 240, 177 P.3d 444 (criminal defendant forfeits his constitutional right to confront the victim at trial when he admittedly and deliberately kills the victim); State v. Cotterell, 2008 MT 409, ¶ 88, 347 Mont. 231, 198 P.3d 254 (a person convicted of unlawfully taking, killing, possessing, or transporting a deer, antelope, elk, or mountain lion “shall forfeit” his or her license for 24 months); Mungas v. Great Falls Clinic, 2009 MT 426, ¶¶ 8-9, 354 Mont. 50, 221 P.3d 1230 (contract provided that doctors forfeit accounts receivable and interest in surgery center if they violate covenant not to compete).
¶69 The JSC, however, construes the forfeiture provision as a resignation provision that works prospectively, where a judge has violated Article VII, Section 10 but refuses to give up his judicial position during his campaign for the nonjudicial office. The JSC acknowledges that Not Afraid did not resign his judicial position when he filed for Crow Tribal Chairman; and, for that, the JSC recommends that we publicly reprimand him. Then, given that Not Afraid ultimately did not win the Tribal Chairman position in the April 2009 general election, the JSC states:
Should [Not Afraid] file for non-judicial elective public office in the future (tribal or non-tribal), and refuse to forfeit any judicial position held at that time, the Judicial Standards Commission *559 will immediately file a formal complaint with the Montana Supreme Court and request immediate suspension from office while the complaint is pending. [Emphasis added.]
¶70 Setting aside the fact that the JSC has no authority to file complaints for the reasons already discussed, the JSC’s approach contemplates that if either of the two events described in Article VII, Section 10 occurs, then the judge must affirmatively resign his or her position in order for the forfeiture to take effect and the office to become vacant. The JSC’s theory appears to be that forfeiture is not automatic but, rather, requires a resignation or some sort of proceeding to declare the judge’s office vacant.
¶71 This approach is wrong and in contradiction to the unambiguous language of the Constitution. Article VII, Section 10 does not give the officeholder the choice or option of whether to resign-and when. The Constitution does not state that the holder of a judicial position “must resign” that position if he either files for a nonjudicial elective public office or absents himself from the state for more than 60 consecutive days. The JSC’s approach reads into the Constitution language that is not there, and ignores the plain language that is there, in violation of this Court’s precedent. See Montanans for Equal Application of Initiative Laws v. State, 2007 MT 75, ¶ 46, 336 Mont. 450, 154 P.3d 1202 (setting out the rules of constitutional construction); see also ¶ 58 n. 6, supra.
¶72 The JSC’s approach would allow a justice of the peace to file and run for the office of Governor while continuing to sit on the bench-so long as the justice refuses to resign, and until he is formally removed from office. Just as untenable, the JSC’s approach would require a resignation or some sort of proceeding to declare a judicial position vacant if the judge leaves the state for six months to take up residence in Argentina with his mistress. That the JSC’s approach would countenance such a result in either case is nonsensical. With respect to the latter situation, moreover, the JSC’s approach is contrary to statute. See § 2-16-501(6), MCA (“An office becomes vacant on the happening of any one of the following events before the expiration of the term of the incumbent:... except as provided in 10-1-1008, absence of the incumbent from the state, without the permission of the legislature, beyond the period allowed by law.” (emphasis added, paragraph breaks omitted)). It should be noted, as well, that by the time the machinery to remove the intransigent judge comes to bear, he will have continued to render decisions-some, perhaps, in cases affecting his campaign contributors and the voters of the county or *560 district over which he presides.[8] He will have shaken hands with, and made campaign promises to, some of the very people who appeared in his court seeking justice or requiring punishment.[9] That is not what the Constitution allows; it is not what the delegates intended; and it is not how this Court interpreted Article VII, Section 10 in Comm, for an Effective Judiciary.
¶73 The fact is that the judge’s formal resignation, or refusal to do so, is completely immaterial. His forfeiture of office occurs by reason of, and coincidentally with, the prohibited act of filing for a nonjudicial elective public office or absenting himself from the state for more than 60 consecutive days. Accordingly, when Not Afraid filed for a nonjudicial elective public office, he immediately forfeited his position as justice of the peace. His office became vacant at the time of filing, without more.
¶74 I recognize that there may be instances in which the officeholder claims that he or she did not file for a nonjudicial elective public office or was not absent from the state for more than 60 consecutive days. In that situation, a fact-finding proceeding may be necessary. But that is not situation here, as it is undisputed that Not Afraid filed for Crow Tribal Chairman-which, under my analysis above, is a nonjudicial elective public office. In this regard, I note that Not Afraid, in response to letters from the JSC directing him to resign, not only refused to do so but also, in blatant defiance of the Constitution, asserted that if he again ran for a tribal office, he would not resign his position as justice of the peace. This is a good example of why forfeiture under Article VII, Section 10 is automatic. A defiant judicial officer must not be allowed, as here, to thumb his nose at the Constitution by refusing to '“resign” his already forfeited office with the challenge, ‘Remove me if you think you can!” |
¶75 Indeed, reflecting this sort of contumaciousness, Not Afraidj argues that his tribal political activities are beyond the reach oil Montana law. Such argument, however, is unavailing and withouij merit. While neither the JSC nor this Court has jurisdiction over the! Crow tribal government and its elected officers, that is not the point! Both the JSC and this Court unquestionably do have jurisdiction oveil Not Afraid as an elected justice of the peace in Big Horn County and! *561 accordingly, must require him to follow Montana’s Constitution and laws in the conduct of his state judicial office. In this regard, Article VII, Section 10 prohibits the holder of a state judicial position from filing for a nonjudicial elective public office (lest he forfeit his current position) without any distinction as to the sovereign to be served. It prohibits him from filing for a Montana nonjudicial elective public office, a federal nonjudicial elective public office, a tribal nonjudicial elective public office, or a nonjudicial elective public office in another state or country. To the extent Not Afraid believes that serving simultaneously in his state judicial office and a tribal executive office are compatible, that argument has already been rejected by the Constitutional Convention delegates. As the Attorney General has pointed out, compatibility is not a factor under Article VII, Section 10. See Mont. Atty. Gen. Op. 44-21, 1991 Mont. AG LEXIS 21 at **7-8 (Oct. 22, 1991).
¶76 In sum, the forfeiture provision of Article VII, Section 10 is self-executing. The act causing the forfeiture-filing for a nonjudicial elective public office or absenting himself or herself from the state for more than 60 consecutive days-immediately and automatically creates a vacancy in the office, which must then be filled according to law. See e.g. Mont. Const, art. VII, §8(2) (Supreme Court justices and district court judges); §3-10-206, MCA (justices of the peace). The language of Article VII, Section 10 requires neither a resignation nor a proceeding to declare the office vacant. The prohibited filing or absence creates the forfeiture, and the forfeiture creates the vacancy.
IV. Conclusion
¶77 The Court’s Opinion today is incredibly far-reaching-and, in my view, patently wrong on any number of levels.
¶78 First, the Court does not adequately address the jurisdiction of the JSC over this case. The JSC’s procedure of hiring its own prosecutor to file a complaint in its own name is contrary to the unmistakable intent of Article VII, Section 11(2) and the dictates of §3-1-1106, MCA, which require that judges and justices be charged and disciplined based upon a complaint filed by a citizen, not the JSC itself. The Court errs in not following these constitutional and statutory mandates. Instead of acknowledging and condemning the JSC’s unlawful process in this case, today’s Opinion blesses the abuse. I cannot agree. After today’s decision, it appears that if the JSC feels the language I have used in this dissent is too ‘intemperate,” Shea, 198 Mont. at 20, 643 P.2d at 213, then the JSC may file a complaint against me sua sponte, land I will be forced to defend in a proceeding where my accuser is also |my judge.
*562 ¶79 Second, while the Court, in one breath, waxes eloquent about the sovereignty of the Crow Tribe as a separate government, the Court then, in the next, demeans that same sovereignty by equating the Crow Tribe to “a group whose membership is narrower than the general public”-not unlike a social club or a sporting group-and by refusing to recognize the offices of the Crow tribal government as “elective public offices.” No doubt the Crow Tribe will be surprised, if not insulted, to learn that its government and its elective public offices are not on the same par as Montana’s. Again, I cannot agree.
¶80 Third, it is now apparently lawful for a sitting Montana justice of the peace, at least, to hold both his or her tribal executive office and his or her Montana judicial office at the same time. This holding perverts another fundamental principle of judicial ethics and conduct enshrined in Article III, Section 1 (Separation of Powers) and Article VII, Section lOmamely, that one cannot serve two masters. AMontana judge or justice cannot serve the master of the judicial branch and the master of the legislative or executive branch at the same time. A judge or justice owes his or her exclusive loyalty and obligation of duty to one branch of government-the judicial branch-4o the exclusion of any loyalty or obligation of duty to either of the other two branches. That is what the doctrine of separation of powers and the prohibition of Article VII, Section 10, read together, require. That fundamental, core principle is written into the 2008 Montana Code of Judicial Conduct, in the Preamble and Rules 1.2, 2.1, 2.2, 3.1, and 3.2-demanding the independence, impartiality, and integrity of the judiciary, and eschewing any appearances of impropriety and conflicts of interest. A sitting Montana judge cannot possibly serve simultaneously as aj publicly elected official in another branch of government, much less inj another sovereign government, and comply with the Constitution and! the Code of Judicial Conduct. A sitting Montana judge cannot owe his! or her professional allegiance to two different sovereigns. He or she! cannot serve two masters-until today. Again, I cannot agree. £
¶81 In sum, I would hold that the JSC had no jurisdiction over thisl action, and I would dismiss the case on this basis. But as to the merit J of the JSC’s complaint, which the Court proceeds to address, I would! hold that Not Afraid forfeited his judicial position on March 6, 2009| when he filed for the office of Crow Tribal Chairman and that hiJ judicial office has been vacant since that date. I would further hole! that any judicial act which Not Afraid performed during his unlawful *563 tenure is, therefore, void ab initio.[10] Finally, I would order that his successor be appointed in accordance with applicable law. Again, I cannot agree with our contrary approach.
¶82 Today’s decision establishes bad policy, bad precedent, and a bad result. I cannot agree. I have no doubt that Montana’s judges will be shocked by the Court’s decision.
¶83 I concur in the result but dissent from the reasoning.

 The composition of the JSC was later amended to be two district judges, one ;omey, and two laypersons. See id. at 1126.

 I believe the JSC also compensated Keller for his time and trouble on behaUj his client, the JSC.

 It is unfortunate that this Court, itself, did not intervene in this matter at tf point. Clearly, we could have and should have under our power of supervisory contn Mont. Const, art. VII, §2(2). See ¶ 48 n. 4, infra.

 This is not to say that cases like this will go unaddressed if no complaint is filed .th the JSC. Constitutionally, this Court has “general supervisory control over all her courts” in this state. Mont. Const, art. VII, §2(2). In cases where the JSC is thout authority to act, as here, this Court has the constitutional power and obligation act sua sponte and to take appropriate action as the Constitution, law, and cumstances require.

 See also e.g. Montana Constitutional Convention, Verbatim Transcript, Feb. 2il 1972, pp. 1049-50 (Delegate Berg): ‘We have deleted from the existing Constitution th| reference to all of the various types of cases that are enumerated there, because : doesn’t add anything and, if anything, it may be limiting. It may be confusing. What tb existing Constitution says and what the majority report says is, it has jurisdiction il all cases in law and equity, including-and then it goes down and it specifies all of the various types of cases that may be included. But we’re looking to the future now. W don’t know and we can’t say, no lawyer here can assure you that the various types I cases enumerated within the old Constitution and still contained in the majority repojj will be adequate for full adjudication of all rights, and what a shame and a colossi mistake it would be for a person to have a wrong and no remedy because the remediil have been so categorized and specified and this particular wrong is not included. Thl would be a colossal error. To avoid that possibility, we have done just like almost si other states, just like the United States Constitution, we’ve said it has origin! jurisdiction in all cases, both civil and criminal. Then we add, so that there’s T question, about the authority of the District Court to issue original and remedial wrifi That covers the waterfront. It covers every conceivable known writ today. If, in til future, it becomes necessary to recognize-perhaps through the Legislature-a new wri| that will accomplish purposes unknown today, the jurisdiction is there to do it.

 ‘In the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted.” Section 1-2-101, MCA. This same rule applies in the construction of constitutional provisions. See State ex rel. Nelson v. Ninth Jud. Dist. Ct., 262 Mont. 70, 79, 863 P.2d 1027, 1032 (1993); accord Opinion, ¶ 15.

 Given the Court’s heavy reliance on the election statutes, one cannot help bu question the incongruity of grounding today’s decision on statutes that do not implement Article VII, Section 10, while completely ignoring statutes that da implement Article VII, Section 11(2). As discussed, §3-1-1106(1), MCA, requires thaij JSC proceedings be founded upon a verified written complaint by a citizen, not upon th<j JSC’s own motion. |

 Of course, those decisions will all be void ab initio. See ¶ 81 n. 10, infra.

 In the present case, Not Afraid conceded that all voters for the Crow Tribi Chairmanship were potential future litigants or defendants before him as Big Hor County Justice of the Peace.

 See Potter v. Sixteenth Jud. Dist. Ct., 266 Mont. 384, 880 P.2d 1319 (1994); State v. Vickers, 1998 MT 201, 290 Mont. 356, 964 P.2d 756; Pinnow v. Mont. State Fund, 2007 MT 332, 340 Mont. 217, 172 P.3d 1273. Potter and Vickers involved individuals who failed to comply with the procedures required by statute for serving as a substitute justice of the peace. In both cases, we held that the failure to comply with these procedures meant that the individual was not a judge and was not vested with the powers and authority of a judge-fche result being that their judicial acts (in particular, the issuance of the search warrants at issue) were void ab initio. See Potter, 266 Mont. at 393, 880 P.2d at 1325; Vickers, ¶¶ 26-29. Similarly, in Pinnow, we held that a district court judge was without authority to assume jurisdiction over a workers’ compensation case following the recusal of the Workers’ Compensation Court judge, and that the case, therefore, had for all intents and purposes been idle since the judge’s recusal and all orders issued by the district court judge were void and of no legal effect. See Pinnow, ¶¶ 15-25,36. Likewise, here, any decisions issued following forfeiture under Article VII, Section 10 are void and of no legal effect.